**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **SELENE CERANKOSKY** and **MARIA ARCARA**, | |
| *Plaintiffs*, | **Case No.** 1:24-cv-1950 _____ |
| v. | **JURY TRIAL DEMANDED** |
| **GREGORY N. WASHINGTON**, President of George Mason University, **SHARNNIA ARTIS**, Vice President for Diversity, Equity, & Inclusion and Chief Diversity Officer, and **THOMAS M. BLUESTEIN**, Title IX Coordinator and Assistant Vice President of Equity and Access Services, all individually and all in their official capacities, | |
| *Defendants*. | |

## <u>PLAINTIFFS' VERIFIED COMPLAINT</u>

Plaintiffs, SELENE CERANKOSKY and MARIA ARCARA, for their Verified Complaint state as follows:

### INTRODUCTION

"If I were king, I would not allow people to go around burning the American flag. However, we have a First Amendment which says that the right of free speech shall not be abridged—and it is addressed in particular to speech critical of the government. That was the main kind of speech that tyrants would seek to suppress." – Justice Antonin Scalia.

1.      It is unconstitutional for the government to punish a private speaker because of the speaker's motivating ideology, opinion, or perspective, or because of the content of that speaker's expression. This prohibition against viewpoint and content discrimination applies fully to public universities.

1

2. George Mason University ("GMU") has failed to abide by this fundamental, clearly established principle because it has enforced its anti-harassment policies to punish students based on the content and viewpoint of their protected speech.

3. Plaintiffs Selene Cerankosky and Maria Arcara are third-year law students at GMU's Antonin Scalia Law School ("Law School").

4. On September 27, 2024, a classmate solicited their opinions in their class-wide "Scalia Law '25" GroupMe chat regarding his proposal for the student government to have GMU put tampons in the men's restroom.

5. Ms. Cerankosky voiced her concern that if GMU adopted a policy "allow[ing] biological females into male restrooms to access period products as 'trans men,'" then that would mean "female bathrooms will welcome male occupants." She asked her classmate to "recognize the concerns of biological female students" and how they would feel "considerably uncomfortable if there are males using private women's spaces on campus." She noted that "[w]omen have a right to feel safe in spaces where they disrobe."

6. Ms. Arcara only posted twice during this conversation to "agree with [Ms. Cerankosky]" and to highlight her concerns for her own privacy and safety "if a biological man is in the [bath]room with [her] at a vulnerable time."

7. Their classmate, who had claimed to be their representative to the student government and initially promised to "advocate for all" students and viewpoints, responded by mocking their concerns and labeling their views as bigoted for questioning others' gender identity.

8. Two weeks later, on October 11, both Ms. Cerankosky and Ms. Arcara received no-contact orders from GMU's Office of Diversity, Equity, & Inclusion ("DEI Office"), prohibiting them from having any contact with their classmate.

9. They did not receive notice that anyone had complained about them and were not given an opportunity to review the allegations against them or defend themselves.

10. Instead of allowing the students to disagree civilly and respectfully with one another and to discuss these important issues, GMU chose instead to censor the Plaintiffs.

11. GMU issued these no-contact orders under their Title IX Sexual Harassment Policy. But GMU has applied this Policy to the students because of their protected speech, not any conduct.

12. Indeed, neither Ms. Cerankosky nor Ms. Arcara have ever spoken to their classmate in person or interacted with him outside of the "Scalia Law '25" GroupMe chat.

13. GMU has also applied this Policy to the students because GMU deemed the content of their speech controversial and because their viewpoints are disfavored or unpopular.

14. These actions violate the students' clearly established rights under the First Amendment's Free Speech Clause and Free Exercise Clause and to procedural due process.

## VENUE

15. Venue is proper in this district and division under 28 U.S.C. § 1391(b) and Local Civil Rule 3 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and because Defendants reside in this district and division.

## JURISDICTION

16. Plaintiffs sue under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution.

17.     Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57, injunctive relief under 42 U.S.C. § 1343 and Federal Rule of Civil Procedure 65, damages under 42 U.S.C. § 1343, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

18.     This Court has original jurisdiction over the federal claims under 28 U.S.C. § 1331.

19.     This Court also has jurisdiction under 28 U.S.C. § 1343 because Plaintiffs seek to recover damages and equitable relief under 42 U.S.C. § 1983.

## PARTIES

### Plaintiffs

20.     Plaintiffs Selene Cerankosky and Maria Arcara are third-year law students at the Law School.

21.     Plaintiffs are also professing Christians who base their beliefs on the Bible and strive to live out their Christian faith at school, at work, and in the community.

22.     Plaintiffs' sincerely held religious beliefs govern their views about all aspects of life, including human nature, sex, and gender.

23.     Plaintiffs are motivated by their sincerely held religious beliefs to share the Gospel of Jesus Christ and to speak on-campus on many topics from a Christian worldview.

24.     Plaintiffs believe that all people should be treated with dignity and respect, that God created every person male or female, and that people should accept their God-given sex and not seek to reject or change it. Plaintiffs believe it would be a lie and a violation of their faith for them to falsely affirm that someone is a member of the opposite sex.

25.     Plaintiffs have also discussed with other students at GMU that having male students in the girls' restroom makes them extremely uncomfortable and anxious. And they have talked with others about their religious beliefs that there are only two sexes and that people cannot change their sex.

26.     Plaintiffs desire to keep using the restroom without members of the opposite sex present. Plaintiffs also want to continue to share their beliefs. For example, they want to continue

to share with others at GMU that they believe there are only two sexes and that people cannot change their sex. They also want to express their discomfort and disagreement with males using the girls' restrooms.

**Defendants**

27.     GMU is a public university organized and existing under the laws of the Commonwealth of Virginia. Antonin Scalia Law School is located on the Mason Square campus in Arlington, Virginia.

28.     Defendant Gregory N. Washington is the President of GMU.

29.     GMU's Board of Visitors has appointed Defendant Washington to be the "chief executive officer" for GMU and given Washington "general authority to manage and operate the University; to establish policies and procedures; [] to comply with executive and statutory mandates; to execute all documents and receive, manage and expend all funds on behalf of the University consistent with guidelines and authorizations established by the budget adopted by the Board[.]" Ex. 1 at 7, 8 (GMU Board of Visitors Bylaws, Articles VI(1) and VII(1)).

30.     GMU's Board of Visitors has authority to appoint the chief executive officer of the institution under Va. Code Ann. § 23.1-1301(A)(3).

31.     Defendant Washington directly oversees GMU's DEI Office. Ex. 2 at 1 (GMU Organization Chart).

32.     Defendant Washington is responsible for the enactment, amendment, and enforcement of university policies and procedures, including Policy 1202—GMU's unconstitutional Sexual Harassment Policy (the "Policy"). Ex. 3 (Policy 1202 – Title IX Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence, updated June 12, 2024).

33.     Defendant Washington is responsible for, among other things, the application and enforcement of the Policy through the two no-contact orders issued against Plaintiffs Cerankosky and Arcara.

34.     Defendant Washington knows or should know that the Policy unconstitutionally regulates speech and has been applied unconstitutionally to Plaintiffs' speech. Although Defendant Washington knows this, he has not amended or repealed the Policy or taken any other corrective action as to their application here.

35.     Defendant Washington is sued for declaratory and injunctive relief in his official capacity and for damages in his individual capacity.

36.     Defendant Sharnnia Artis is the Vice President for DEI and Chief Diversity Officer for GMU.

37.     As Vice President for DEI and Chief Diversity Officer, Defendant Artis oversees all aspects of the DEI Office, including "investigating allegations of discrimination and prohibited conduct, and affecting University policy management." Ex. 4 at 2 (DEI Office webpage, "Meet Our Staff"); Ex. 5 at 1 (DEI Office Organization Chart).

38.     Defendant Artis was responsible for the enforcement of University policies and procedures, including the Policy.

39.     Defendant Artis was responsible for, among other things, the application and enforcement of the Policy through the two no-contact orders issued against Plaintiffs Cerankosky and Arcara.

40.     Defendant Artis knows or should know that the Policy unconstitutionally regulates student speech and has been applied unconstitutionally to Plaintiffs' speech. Although Defendant Artis knows this, she has not amended or repealed that Policy or taken any other corrective action.

41.     Defendant Artis is sued for declaratory and injunctive relief in her official capacity and for damages in her individual capacity.

42.     Defendant Thomas "Tom" M. Bluestein serves as the Assistant Vice President for Equity and Access Services and Title IX Coordinator for GMU. Ex. 5 at 1.

43.     As the Title IX Coordinator, Defendant Bluestein oversees GMU's Title IX Office, including "coordinating the University's investigation, response, and resolution of all reports of

Prohibited Conduct; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects." Ex. 3 at 13–14, Sec. IV(A).

44.     Defendant Bluestein is also responsible for "implement[ing] support[ive] measures," such as no-contact orders, under the Policy. Ex. 6 at 4 (GMU Title IX FAQs).

45.     Defendant Bluestein was responsible for, among other things, the application and enforcement of the Policy through the two no-contact orders issued against Plaintiffs Cerankosky and Arcara.

46.     Defendant Bluestein knows or should know that the Policy unconstitutionally regulates student speech and has been applied unconstitutionally to Plaintiffs' speech. Although Defendant Bluestein knows this, he has not amended or repealed that Policy or taken any other corrective action.

47.     Defendant Bluestein is sued for declaratory and injunctive relief in his official capacity and for damages in his individual capacity.

48.     Each of the acts and policies alleged in this Complaint are and were attributed to Defendants who have acted and continue to act under color of a statute, regulation, or custom of the Commonwealth of Virginia.

## FACTUAL ALLEGATIONS

### I.     Defendants' challenged Policy

49.     GMU's DEI and Title IX Offices implement and enforce several nondiscrimination policies, including the Policy.

50.     The Policy defines "Prohibited Conduct" to include "sexual harassment," which it defines as "unwelcome conduct based on sex" that "is so severe, persistent, or pervasive that it alters the conditions of education, employment, or participation in a University program or activity, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive." Ex. 3 at 8, Sec. III(B)(a)(ii).

Whether conduct is "unwelcome" is assessed via a "subjective determination based on the specific Complainant." *Id.* at 13, Sec. III ("Supportive Measures" definition).

51. Defendants interpret the Policy's prohibition against sexual harassment as encompassing protected speech.

52. The Policy permits the implementation of "Supportive Measures" to "deter [alleged] Prohibited Conduct," such as sexual harassment. *Id.* ("Supportive Measures" definition).

53. If a student reports sexual harassment, the Title IX Coordinator "is responsible for providing Supportive Measures, as deemed appropriate by the Title IX Coordinator." *Id.* at 16, Sec. IV(C). "Supportive Measures are available regardless of whether a Complainant pursues a [formal] complaint or investigation under [the] policy." *Id.* at 17.

54. "Supportive Measures" include "no-contact directives." *Id.* at 16.

55. The Policy does not require the DEI Office to determine that sexual harassment occurred or likely occurred.

56. The Policy does not require the DEI Office to find that sexual harassment is likely to occur in the future.

57. The Policy does not require the DEI Office to give notice or a hearing to the respondent before issuing these so-called "Supportive Measures."

58. The Policy also fails to require the DEI Office—either before or when they impose the interim measures—to advise the respondent of the allegations against the respondent or give the respondent the opportunity to be heard.

59. The Policy does not provide for any appeal of "Supportive Measures" imposed by the DEI Office, including no-contact orders.

60. Moreover, the Title IX Office has the sole "discretion to impose and/or modify any interim Supportive Measure based on all available information." *Id.* at 17.

61. Students who "violate [the Policy] may face disciplinary action up to and including termination or expulsion." *Id.* at 5, Sec. II.

## II. Defendants punish Plaintiffs for expressing their religious beliefs

62.     Defendants have applied the Policy against each of the Plaintiffs based on Plaintiffs' religious speech.

### A. The "Scalia Law '25" GroupMe chat

63.     Plaintiffs and their law school classmates are members of the "Scalia Law '25" GroupMe chat.

64.     One of those classmates is the subject of the no-contact orders against Plaintiffs. To respect his privacy, Plaintiffs refer to him as Mr. Doe.[1]

65.     The "Scalia Law '25" GroupMe chat is open to anyone, but it is meant for third-year law students at the Law School.

66.     This chat was created by students and is not officially governed by any GMU policy.

67.     The chat is commonly used by students to advertise club events, share memes, and engage in discussions with the Law School student body.

68.     For example, Mr. Doe promoted LGBT events on campus, including a "Pride on the Plaza Event." Ex. 7 at 23 (Screenshots of "Scalia Law '25" GroupMe chat dated Sept. 27, 2024).

### B. Mr. Doe claims to be Plaintiffs' representative to GMU'S Graduate and Professional Studies Assembly

69.     On September 27, 2024, Mr. Doe announced in the GroupMe chat that he was "officially the Law School/Student Representative for GAPSA (Graduate and Professional Studies Assembly)" at GMU. *Id.* at 1. He informed students that "GAPSA reports up and down the chain of command" at GMU "from the Board of Visitors, President, etc." He added that he had "already shared" some "concerns" raised by law school students. *Id.*

---

[1] Plaintiffs have also redacted Mr. Doe's name and other personally identifying information from the exhibits to the Complaint.

70.     Plaintiffs were surprised to read Mr. Doe's announcement, as Scalia Law's Student Bar Association ("SBA") had never announced a process for appointing the GAPSA representative or indicated that one had been chosen.[2]

71.     In holding himself out as the GAPSA representative, Mr. Doe claimed to represent the views of all law students at Scalia Law. Indeed, he claimed that he would "do [his] best to advocate for all of us." *Id.*

### C.      Mr. Doe announces proposal to have GMU place female hygiene products in the men's bathroom

72.     One of the "concerns" Mr. Doe said he raised to GAPSA included a proposal to have GMU "establish[] Hygeine [*sic*] product disposal containers/and products in ALL restrooms ... (regardless of gender marker/sign outside of the restroom)." *Id.*

73.     Plaintiffs were concerned that someone claiming to be their representative used this position to advocate for a policy change at GMU that posed a risk to Plaintiffs' personal safety and conflicted with Plaintiffs' religious beliefs on sex and gender without offering any opportunity to hear opposing viewpoints or concerns.

74.     It was only after Mr. Doe made his proposal that he asked, "if there are concerns [students] would like addressed." *Id.*

75.     Ms. Cerankosky responded to Mr. Doe's request for concerns. She noted that his "advocacy for female [hygiene] products in the male restrooms" implied that "male bathrooms will welcome female occupants and female bathrooms will welcome male occupants." She then voiced her concern that she would feel "considerably uncomfortable" if "males us[ed] private women's spaces on campus." *Id.* at 4.

76.     Eleven other students expressed their agreement with Ms. Cerankosky by "liking" her message. *Id.*

---

[2] The SBA later clarified that Mr. Doe did "not properly occupy[] the 'office' of GAPSA Representative and does *not* represent SBA or the law school." Ex. 8 at 1 (Email from SBA to Plaintiffs) (emphasis added).

77.     Ms. Cerankosky's concern with Mr. Doe's proposal was motivated not just by concern for her privacy or safety but also by her sincerely held religious beliefs on sex and gender.

78.     Indeed, one student posted that the proposal concerned "a moral and safety issue for many people" and requested that Mr. Doe ensure those voicing such concerns "are heard during any discussion with administration, so as not to discourage or exclude students with conservative values." *Id.* at 5.

79.     Ms. Arcara agreed. She stated that "conservative students have as much a right to be represented at [GMU] as anyone else" and that "[conservatives] have the right to argue for [the bathroom policy] remaining as it is." *Id.* at 7.

80.     Ms. Arcara echoed Ms. Cerankosky's safety concerns, highlighting how she would not want "a biological man" "in the [bath]room with [her] at a vulnerable time." *Id.*

81.     Ms. Arcara and Ms. Cerankosky civilly and respectfully expressed their disagreement with Mr. Doe's proposal.

82.     Mr. Doe, however, responded to Ms. Cerankosky and Ms. Arcara by labeling their concerns as bigoted, despite soliciting their opinions and initially promising to "advocate for all" students. *Id.* at 1. He stated that their views of "one's gender" were just "a perception," *id.* at 15, and that it wasn't any of their "business what gender someone identifies with, as, or if they identify with any at all." *Id.* at 9.

83.     He further mocked their concerns and beliefs by asking if a male "need[ed] to have a shaved head, have or not have certain anatomy, not wear makeup, dress a certain way, or fit a systemic stereotype of a 'male.'" *Id.* at 15.

84.     Ms. Cerankosky did not respond in kind. She simply responded, "[r]espectfully, ... as women, it is absolutely our business if a male enters our bathroom." *Id.* at 10.

85.     Several other students participated in the GroupMe conversation, some of whom posted messages agreeing with the proposal to add tampons in the men's bathroom. As such, some of Ms. Cerankosky and Ms. Arcara's statements were made in response to students other than Mr. Doe.

**D.** **Defendants issue no-contact orders against Plaintiffs because of their religious expression**

86. Two weeks later, on October 11, Ms. Cerankosky and Ms. Arcara each received a no-contact order issued by Defendant Bluestein. Exs. 9 (No-Contact Order issued to Ms. Cerankosky), 10 (No-Contact Order issued to Ms. Arcara).

87. The orders are substantively identical and prohibit each of the Plaintiffs from having any contact with Mr. Doe.

88. The orders prohibit Plaintiffs from "contact[ing] [Mr. Doe] physically, in person, by phone, text, email, instant messenger, written notes, social media, (including, but not limited to: Facebook, X/Twitter, Snapchat, Instagram, Google Hangout) or any other method of communication." Exs. 9, 10 at 1.

89. Defendant Bluestein warned Plaintiffs that a no-contact order "can lead to disciplinary action if one allegedly violates" it. Exs. 11 at 1 (Email Chain, "Re: NOTICE OF NO CONTACT ORDER"), 12 at 1 (Email, "Meeting Summary/Follow-Up").

90. Defendants may impose "disciplinary action" "up to and including…expulsion" for violating a no-contact order. Ex. 3 at 5, Sec. II.

91. Plaintiffs also "may not request or direct another person to communicate on [their] behalf with [Mr. Doe]." Exs. 9, 10 at 1. Thus, these orders not only threaten Ms. Cerankosky and Ms. Arcara with disciplinary action if they continue to speak up in response to Mr. Doe; Defendants threaten to discipline Plaintiffs if any of their friends do so as well.

92. The orders apply anywhere and everywhere, both on- and off-campus.

93. The orders do not have a termination date. *Id.*

94. The orders also state that Mr. Doe has received a similar no-contact order prohibiting him from contacting either of the Plaintiffs. *See id.*

95. Defendants did not conduct any investigation or present any factual findings or witnesses to any Plaintiff, or give any Plaintiff an opportunity to respond to the complaints against them before they issued the orders.

96. Defendant Bluestein admitted in an email to Ms. Cerankosky that "there is no investigation pending or open" as of October 15. Ex. 12 at 2. Defendant Bluestein admitted the same in a separate email to Ms. Arcara. Ex. 11 at 1.

97. In fact, Defendants did not even contact Plaintiffs before issuing these orders.

98. The no-contact orders do not specify the reason the orders were issued.

99. On information and belief, Defendants issued the no-contact order against Plaintiffs because they responded in the "Scalia Law '25" GroupMe chat to Mr. Doe's proposal to have GMU place female hygiene products in men's restrooms on September 27.

100. On information and belief, Defendants issued these no-contact orders pursuant to the Policy.

101. On information and belief, Defendants have not issued no-contact orders to students who responded to Mr. Doe's proposal favorably and who expressed views on sex and gender opposed to Plaintiffs' views, including speech expressly criticizing or mocking Plaintiffs.

## III. Plaintiffs object to the orders

102. On October 12, Ms. Arcara emailed Defendant Bluestein expressing her confusion as to why she was issued a no-contact order. *See* Ex. 11 at 2.

103. Ms. Arcara explained that she has "never spoken to [Mr. Doe] in person" nor "contacted him directly using email, messages, or any other virtual platform." *Id.*

104. Ms. Arcara noted that her only interaction with Mr. Doe took place in the "Scalia Law '25" GroupMe chat after Mr. Doe "publicly expressed an opinion that is a subject of current political debate," and she "expressed [her] objections to [his] position, based on [her] political and religious beliefs." *Id.*

105. Ms. Arcara expressed her dismay that GMU had "barred [her] from responding publicly to a public statement about a politically controversial topic[.]" *Id.*

106. On October 15, Defendant Bluestein emailed Ms. Arcara explaining that the no-contact order was "issued upon receipt of a report of alleged prohibited conduct that falls within Title IX (or Policy 1202) jurisdiction." *Id.* at 1.

107. Defendant Bluestein informed Ms. Arcara that the "alleged prohibited conduct here" is "the <u>effect</u> of speech on a member of the Mason community." *Id.*

108. Defendant Bluestein stated that "[e]ven if there was an investigation and you were found not responsible for violating Policy 1202, the Federal Title IX regulation and University Policy allow supportive measures, such as [no-contact orders] to persist between parties." *Id.*

109. Ms. Cerankosky responded to the order by setting up a meeting with Mr. Bluestein on October 15th, during which Mr. Bluestein gave her similar information.

110. After the meeting, Defendant Bluestein emailed Ms. Cerankosky reiterating his position that the "alleged prohibited conduct" is "about the <u>effect</u> of speech in the GroupMe[.]" Ex. 12 at 2.

## IV. Plaintiffs are suffering ongoing harm from the no-contact orders

111. Because of these orders, both Plaintiffs credibly fear that Defendants will sanction Plaintiffs or issue other no-contact orders if Plaintiffs express their religious beliefs, even if they do so in direct response to a question asking what their beliefs are and why they hold those beliefs.

112. Defendants' no-contact orders have inflicted great stress and anxiety on Plaintiffs.

113. Plaintiffs fear that any expression of their sincerely held religious beliefs will run afoul of Defendants' interpretation of their policies.

114. Plaintiffs worry what they can and cannot say on campus without running afoul of Defendants' policies.

115. Indeed, Defendant Bluestein warned Plaintiff Cerankosky that he "cannot guarantee" that she "will not be alleged to have violated" the no-contact order. *Id.* at 1.

116.     With respect to communications "in the GroupMe" or "other venues" Defendant Bluestein instructed Plaintiffs to not "tag" or "otherwise use the other party's name in a response[.]" *Id.* at 2, Ex. 11 at 1.

117.     He also stated that he "believe[d]" Plaintiffs "can respond to things posted by the other party," but warned them to "tailor" their response to the "issue," "not the individual." Ex. 12 at 2, Ex. 11 at 1.

118.     But Defendant Bluestein issued the no-contact orders to Plaintiffs after they did just that: expressing their religious beliefs about the "issue."

119.     Plaintiffs only voiced their concerns with biological males using the women's bathroom and their religious beliefs about sex and gender after Mr. Doe asked for their concerns about his proposal to place female hygiene products in the men's bathroom.

120.     Further, several other students participated in the GroupMe conversation, some of whom posted messages agreeing with the proposal to add tampons in the men's bathroom. As such, some of Ms. Cerankosky and Ms. Arcara's statements were made in response to students other than Mr. Doe.

121.     Neither Ms. Cerankosky nor Ms. Arcara "tag[ged]" Mr. Doe during the September 27 conversation in the "Scalia Law '25" GroupMe chat. *See* Ex. 7.

122.     Ms. Cerankosky used Mr. Doe's name only once when she replied to *his* response to her concern. Ms. Cerankosky did so in a respectful manner, saying "Respectfully, [Mr. Doe], as women, it is absolutely our business if a male enters our bathroom." *Id.* at 10.

123.     Thus, Plaintiffs cannot "tailor" their religious expression other than by remaining silent to avoid receiving future no-contact orders.

124.     Defendant Bluestein's "belie[f]" provided no consolation to Plaintiffs, particularly when the decision to issue future no-contact orders is purely up to his discretion.

125.     Plaintiffs therefore have self-censored on campus when expressing their religious beliefs and other beliefs that some may disagree with.

126.    Plaintiffs want to continue to share their beliefs. For example, they want to continue to share with others at GMU that they believe there are only two sexes and that people cannot change their sex. They also want to express their discomfort and disagreement with males using the girls' restrooms.

127.    Before speaking, Plaintiffs weigh how other students will receive their speech and whether their speech will prompt that student to complain to Defendants.

128.    Plaintiffs must also contend with the constant fear that Defendants may issue future no-contact orders on the basis of their protected speech at any time and without prior notice or process.

129.    Ms. Cerankosky and Ms. Arcara are the same year as Mr. Doe. They currently have one class with him and may have classes with him in the future. They are worried about addressing or responding to Mr. Doe or even Mr. Doe's statements or ideas in these classes.

130.    Neither Ms. Cerankosky nor Ms. Arcara have ever spoken or interacted with Mr. Doe in person.

131.    Before the September 27 incident, Ms. Cerankosky and Ms. Arcara had only respectful interactions with Mr. Doe in the "Scalia Law '25" GroupMe chat.

132.    Plaintiffs also suffer stress and anxiety from the future consequences of Defendants' no-contact orders.

133.    Plaintiffs are both in law school and intend to apply for admission to the bar so that they can practice law.

134.    Bar applications often ask questions relating to discipline by academic institutions.

135.    A disciplinary record from an academic institution could jeopardize admission to the bar.

136.    For example, Virginia's application for admission to the bar asks whether an applicant has "ever been academically, administratively or otherwise disciplined, placed on probation, suspended, expelled, requested to terminate [his/her] enrollment, or allowed to resign in lieu of disciplinary action at any college, university, law school, trade school or any other post-

high school educational facility." Virginia Board of Bar Examiners, Character and Fitness Questionnaire Sample Form at 5, https://barexam.virginia.gov/pdf/SampleCFQ.pdf (rev. Oct. 2018).

137. The application requires an applicant to describe "the alleged violation, any action by the institution, the date of the action, and a full explanation of the reasons for such action." *Id.*

138. At the very least, Defendants' no-contact orders may constitute informal discipline.

139. Plaintiffs thus credibly fear that Defendants' no-contact orders may endanger their future careers and cause them to have diminished earning potential.

140. Plaintiffs have observed that GMU allows students to discuss almost any content with each other, whether in the classroom, in the hallways, or elsewhere on or off campus.

141. Plaintiffs have also observed that GMU allows, and even promotes, students who express viewpoints on sex and gender opposed to their own.

142. Plaintiffs attempted to resolve this dispute without court intervention.

143. On October 12, Ms. Arcara emailed Defendant Bluestein requesting that he lift the no-contact order with respect to her statements in the "Scalia Law '25" GroupMe chat given "the serious First Amendment issues implicated" by the order. Ex. 11 at 2.

144. Plaintiffs explained that the no-contact orders violated Plaintiffs' First Amendment rights because they were issued based on the content and viewpoint of Plaintiffs' religious speech. Plaintiffs further explained that the no-contact orders violated Plaintiffs' due process rights because GMU had conducted no investigation and without any formal or even informal hearing.

145. Unfortunately, GMU refuses to rescind the no-contact orders. GMU insists that Title IX authorizes it to issue these no-contact orders as supportive measures solely because Mr. Doe disagreed with Plaintiffs' expression.

## COUNT I
## First Amendment: Freedom of Speech
## 42 U.S.C. § 1983

146.     Plaintiffs reallege all matters set forth in paragraphs 1–145 and incorporate them herein.

147.     The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits censorship of speech, including religious expression.

148.     Private student expression is protected by the First Amendment.

149.     A public university cannot restrict a student's private expression based on either its content or its viewpoint unless that restriction serves a compelling governmental interest and is narrowly tailored to that interest.

150.     But Defendants here have censored Plaintiffs based on the content and viewpoint of their speech.

151.     Plaintiffs' religious expression during the "Scalia Law '25" GroupMe conversation on September 27 is protected speech under the First Amendment.

152.     Pursuant to the Policy, Defendants have singled out Plaintiffs' expression and prevented them from engaging in religious expression with Mr. Doe.

153.     Defendants' no-contact orders have also chilled Plaintiffs from engaging in religious expression with other students at the Law School or the rest of GMU.

154.     Defendants have thus censored Plaintiffs based on Plaintiffs' religious views and on the content of their speech.

155.     Indeed, Defendants allow speech between students on a wide variety of content. Nor have Defendants censored students who express views on sex and gender opposed to Plaintiffs' views.

156.     Defendants' censorship does not serve any compelling government interest, nor is it narrowly tailored to any such interest.

157.    In addition to it failing to be a content-neutral restriction, Defendants' no-contact order is unconstitutional because it is not narrowly tailored to serve a significant government interest and does not leave open ample alternative channels of communication.

158.    The Policy also violates the First Amendment's Free Speech Clause because it grants Defendants unbridled discretion to restrict protected speech.

159.    By permitting Defendants to issue no-contact orders without first requiring them to find an actual violation of the Policy and without providing notice and a hearing to the respondent, Defendants have license to issue no-contact orders against views or content they deem to be controversial or unpopular.

160.    Further, Defendants can issue no-contact orders for an indefinite duration and also have discretion to restrict different types of content or viewpoints in the no-contact orders themselves.

161.    Defendants' no-contact orders and the Policy also violate the First Amendment's Free Speech Clause because they are unconstitutional prior restraints on speech.

162.    Defendants cannot justify the no-contact orders under strict scrutiny. Nor can Defendants justify them even as a content-neutral regulation under intermediate scrutiny.

163.    Defendants also cannot justify the Policy to the extent that it authorizes no-contact orders issued solely based on a student's expressive activity.

164.    The Policy also violates the First Amendment's Free Speech Clause because it is facially overbroad.

165.    Defendants' definition of sexual harassment reaches a substantial amount of constitutionally protected speech.

166.    By defining sexual harassment as conduct that is "so severe, persistent, *or* pervasive" that it "alters the conditions of education" in a "University program or activity," GMU can punish virtually any protected expression as harassment.

167.    Similarly, by defining sexual harassment based on what someone "with similar identities" to the Complainant "would find hostile, intimidating, or abusive," the Policy requires

the consideration of a broad array of characteristics, including race, religion, sex, and sexual orientation, thereby enabling GMU to punish virtually any protected expression as harassment.

168.    Lastly, by defining sexual harassment to include an assessment of "whether conduct is unwelcome" via a "subjective determination based on the specific Complainant," GMU can punish virtually any protected expression as harassment.

169.    The overbreadth of the Policy chills Plaintiffs' speech.

170.    To the extent that Defendants issued the no-contact orders based on this type of harassment or potential harassment, Defendants have unconstitutionally discriminated against Plaintiffs under this Policy because Plaintiffs engaged in protected expression.

171.    The Policy and Defendants' enforcement of that Policy are therefore unconstitutionally overbroad and violate Plaintiffs' free speech rights under the First Amendment's Free Speech Clause.

172.    The Policy, both facially and as-applied, violates the Free Speech Clause of the First Amendment.

173.    Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT II**
**First Amendment: Free Exercise of Religion**
**42 U.S.C. § 1983**

174.    Plaintiffs reallege all matters set forth in paragraphs 1–145 and incorporate them herein.

175.    Plaintiffs are motivated by their sincerely held religious beliefs to speak on-campus on many topics from a Christian worldview. Plaintiffs believe their on-campus speech is a way to share the Gospel of Jesus Christ with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

176. The First Amendment's Free Exercise Clause guarantees religious believers–at a bare minimum—equal treatment.

177. A public university policy that burdens religious exercise and is not both neutral and generally applicable must satisfy strict scrutiny.

178. And a public university policy that targets religious beliefs is never permissible.

179. Defendants' application of the Policy burdens religious exercise because Defendants apply this Policy to exclude certain religious viewpoints.

180. The Policy, facially and as-applied, is not neutral or generally applicable.

181. Rather, Defendants have specifically targeted Plaintiffs' speech on sex and gender because of the religious views Plaintiffs expressed in the "Scalia Law '25" GroupMe conversation on September 27.

182. The Policy also creates a system of individualized governmental assessments of the reasons for the relevant Prohibited Conduct.

183. Defendants' no-contact orders show hostility to religious people and beliefs as Defendants did not censor other students who spoke on the same topic but from a viewpoint opposing Plaintiffs. The orders and the Policy thus flunk neutrality.

184. Defendants' application of the Policy does not support a compelling government interest and is not narrowly tailored to any such interest.

185. Defendants' application of this Policy thus violates the Free Exercise Clause of the First Amendment.

186. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

## COUNT III
### Fourteenth Amendment: Procedural Due Process
### 42 U.S.C. § 1983

187.     Plaintiffs reallege all matters set forth in paragraphs 1–145 and incorporate them herein.

188.     Before a public university can discipline a student, procedural due process requires at a minimum that the student be given notice and an opportunity for a hearing before an impartial tribunal.

189.     By issuing no-contact orders against Plaintiffs and threatening penalties for violating those orders, Defendants disciplined them for their religious speech.

190.     But Defendants, pursuant to the Policy, did not give notice or an opportunity for a hearing before an impartial tribunal to any of the Plaintiffs.

191.     Nor did Defendants set a hearing after the no-contact orders were issued to determine whether the keep the orders in place after a certain point.

192.     In fact, the no-contact orders remain in place indefinitely unless the DEI Office orders otherwise.

193.     Defendants have thus violated Plaintiffs' right to procedural due process under the Fourteenth Amendment.

194.     Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.     Declare that Defendants' no-contact orders and the Policy's definition of sexual harassment, facially and as-applied, violate Plaintiffs' rights under the First Amendment, Fourteenth Amendment, and Virginia's Religious Freedom Restoration Act.

2.     Enter a preliminary and permanent injunction ordering Defendants sued in their official capacities, including their agents, officials, servants, employees, and any other persons

acting on their behalf, to (1) stop enforcing the no-contact orders and the Policy against protected expression, whether through formal discipline, "interim action," "supportive measures," or in any other way; (2) terminate any investigation related to the no-contact orders issued to Plaintiffs based on allegations of protected speech alone; and (3) remove any reference to the no-contact orders and investigations related to the no-contact orders in the University's records for Plaintiffs;

3.      Award compensatory damages for the reputational and emotional harm and distress Defendants have caused Plaintiffs;

4.      Award nominal damages for the violation of Plaintiffs' constitutional and statutory rights;

5.      Award reasonable costs and expenses of this action, including court costs and reasonable attorneys' fees as provided by 42 U.S.C. § 1988; and

6.      Grant of any other relief the Court deems equitable and just in the circumstances.

Respectfully submitted this 1st day of November, 2024.

/s/ Jonathan Caleb Dalton

J. Caleb Dalton
VA Bar No. 83790
Tyson Charles Langhofer*
VA Bar No. 95204
Matthew C. Ray*
VA Bar No. 100510
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
T: (571) 707-4655
F: (571) 707-4656
CDalton@adflegal.org
tlanghofer@ADFlegal.org
mray@adflegal.org
**Counsel for Plaintiffs Selene
Cerankosky and Maria Arcara**

*EDVA Admission pending*

**DEMAND FOR TRIAL BY JURY**

Plaintiffs Selene Cerankosky and Maria Arcara hereby demand a trial by jury for all issues so triable.

/s/ Jonathan Caleb Dalton

J. Caleb Dalton
**Counsel for Plaintiffs Selene Cerankosky and Maria Arcara**

## DECLARATION UNDER PENALTY OF PERJURY

I, Selene Cerankosky, a citizen of the United States and a resident of the State of Virginia, have read the forgoing complaint and hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of October, 2024, at <u>FALLS CHURCH</u>, Virginia.

<u>Selene Cerankosky</u>
Selene Cerankosky

## DECLARATION UNDER PENALTY OF PERJURY

I, Maria Arcara, a citizen of the United States and a resident of the State of Pennsylvania, have read the forgoing complaint and hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of October, 2024, at *Arlington County*, Virginia.

_Maria E. Arcara_
Maria Arcara